**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

THOMAS ATKINS

  v.         Civil No. CCB-06-278

WINCHESTER HOMES, et al.

## MEMORANDUM

Now pending before the court are motions to dismiss filed by defendants Winchester

Homes, Inc. ("Winchester"), Winchester's parent company, Weyerhaeuser Company

("Weyerhaeuser"), and individual defendants Edward Duffy, Larry Freiert and Edward Brooks.

The plaintiff, Thomas Atkins, has sued the defendants for alleged violations of Title VII of the

Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* and 42 U.S.C. § 1981 arising

out of his employment as a Component Specialist with Winchester Homes.  The issues in this

case have been fully briefed and no hearing is necessary.  *See* Local Rule 105.6.  For the reasons

stated below, the defendants' motion will be granted in part and denied in part.

## BACKGROUND

Plaintiff Thomas Atkins is a forty-one year old Maryland resident of Native American

national origin.  On July 2, 2001, Atkins began his employment as a Component Specialist for

home building construction for Winchester, a home building company.  Defendant Larry Freiert

was employed by Winchester as the Baltimore Supervisor/President overseeing the working

environment of the plant of employees where Atkins worked.  Defendant Edward Brooks was

employed by Winchester as a Plant Foreman/Floor Manager and was either the floor supervisor

or Atkins's immediate supervisor during the relevant time period.  Defendant Edward Duffy was

employed by Winchester as a Plant Manager/Supervisor and was Atkins's immediate supervisor during the relevant time period.

Atkins alleges that beginning in February 2003, he was subjected daily to racial harassment from his co-workers, including a number of racial slurs[1]. (Am. Compl. at ¶ 17.) Atkins's co-workers would walk by his work station and tap their hands over their mouths chanting "Woo Woo Woo", in apparent mockery of stereotypical Native American war chants. Additionally, his co-workers would frequently call or identify Atkins as "Redskin, Pocahontas, Injun, Cochise, Chief, Tonto, and Geronimo." (*Id.* at ¶ 19.) On or about March 2003, a co-worker, Gary Hall, told Atkins that Atkins was "the ugliest version of Pocahontas" that Hall had "ever seen" and that Atkins was a "broke down pale face version of Tonto." (*Id.* at ¶ 21.)

Atkins claims that his supervisors, Freiert, Duffy, and Brooks personally witnessed or knew about the conduct by Atkins's co-workers, but did nothing to prevent the harassment. At times, Atkins's supervisors would laugh at him when the racial harassment occurred. (Am. Compl. at ¶ 20.) Specifically, Atkins alleges that Duffy and Brooks heard the comments made by Hall in March 2003, and laughed alongside his co-workers. (*Id.* at ¶ 21.)

In his complaint, Atkins claims that during this time period, he was "constantly called into Duffy's office and threatened with discipline despite [Atkins] raising these issues of workplace racial harassment." (Am. Compl. at ¶ 22.) Atkins's complaint does not make clear whether he initiated these meetings with Duffy to address the incidents of racial harassment, or

---

[1]Elsewhere in his complaint, Atkins claims that the discrimination began earlier. Atkins alleges he raised issues of racial discrimination with Winchester's Human Resources Department beginning on Nov. 26, 2001, after one of his co-workers, Antoine Smith, used racist language. (Am. Compl. at ¶ 31.) Shortly after the incident with Atkins, Smith wrote a negative peer evaluation of Atkins, which was submitted to management.

whether Duffy called Atkins in his office for other reasons.  In any event, Atkins reports that Duffy told Atkins that he was in his office complaining about racial harassment more than any other employee.  Duffy also told Atkins, "You're Indian.  I don't understand how you let these guys get you angry.  After all, that's not the way of your people."  (*Id.* at ¶ 23.)

Atkins further alleges that another of his co-workers, Antoine Smith, cursed at him for Atkins's alleged failure to perform his work in an acceptable manner.  (Am. Compl. at ¶ 24.) Atkins immediately complained to Freiert, who is alleged to be responsible for overseeing the operation of the plant where Atkins worked, and described all of the events occurring in the previous few weeks.  Atkins also highlighted the lack of assistance from Duffy and Brooks.  (*Id.*) In response to that meeting, Freiert spoke to Smith and Duffy about Atkins's complaints of racial harassment.  (*Id.* at ¶ 25.)  Immediately after that meeting, Smith again cursed at Atkins, calling Atkins "you fat ass bitch, fuck you Pocahontas" and saying "you can suck my black dick."  (*Id.* at ¶ 25.)  Brooks witnessed this incident but took no action against Smith.

After the incident with Smith, Atkins had a run-in with another co-worker, Woodrow Gunther.  Gunther failed to perform an assigned task because he was talking to Brooks; Brooks then assigned that task to Atkins.  After Atkins reported the incident to Duffy, Gunther approached Atkins and told him "If I get written up because of your Redskin ass, I'm going to fuck you up when we get off work."  (Am. Compl. at ¶ 26.)  Atkins responded by stating "Don't wait til we get off.  If you want a piece of me, then come get it."  No actual violence took place as a result of this incident.  Atkins was written up by Brooks for this incident, but Gunther was not.  (*Id.*)

In addition to raising his complaints with Winchester management, Atkins also claims that he raised his concerns with Weyerhaeuser, Winchester's parent company.  (Am. Compl. at ¶ 32.)  Atkins called Weyerhaeuser's toll-free discrimination hotline several times in September 2003, December 2003, and January 2004.  Atkins claims that Weyerhaeuser never followed up or investigated Atkins's claims.  In a letter to the EEOC, Weyerhaeuser claimed that its Human Resources and Business Conduct Committee have not been able to find any record of any calls from Atkins.  (*See* Am. Compl. at Ex. 7.)

Some unspecified time after these incidents, Atkins injured his back and left shoulder on the job.  After receiving minimal care and light-duty status, Atkins was warned by Duffy not to take too many sick days off, or risk being terminated.  (Am. Compl. at ¶ 27.)  Atkins reports that Duffy made this threat of firing regularly through the course of the year.  Later, on February 7, 2004, Atkins injured his thumb with a hammer while at work nailing a cross brace.  Atkins requested that the doctor treating him remove the nail; instead, the clinic pushed the nail back in the skin, causing plaintiff no immediate use of his left hand.  (*Id.* at ¶ 28.)  When plaintiff returned to work, he again was given light-duty work.  On February 14, 2004, Atkins was fired by Duffy for "safety reasons" and Atkins's attitude.  (*Id.* at ¶ 29.)

On or about November 30, 2004, Atkins filed a Charge of Unlawful Discrimination with the EEOC.  (Am. Compl., at Ex. 1.)  In this Charge of Discrimination, Atkins noted that his cause of discrimination was based on race, and that the discrimination was continuing.  Atkins listed only Winchester as his employer.  In the Particulars section, Atkins stated "See Attached Statement."  With Atkins's initial complaint, filed in this court, he failed to include that attached statement, but with his amended complaint, Atkins provided the forms he allegedly attached to

his EEOC charge.

In addition to the EEOC charge, plaintiff filed a charge with the Maryland Commission on Human Relations ("MCHR") on or about January 21, 2005, alleging discriminatory events from February 1, 2003 to February 14, 2004. (*See* Am. Compl. at Ex. 2.)  This statement named both Winchester and Weyerhaeuser Company as Atkins's employers.  On or about February 16, 2005, the EEOC issued the MCHR a notice that plaintiff's claims were to be investigated by the EEOC.  On that same day, the EEOC issued its Notice of Charge of Discrimination to Weyerhaeuser Company, which was Weyerhaeuser's first formal notice of Atkins's claims.

On or about September 26, 2005, after a fact-finding investigation, the EEOC reached a determination in Atkins's Charge of Discrimination.  The EEOC found "[b]ased on the analysis of evidence ... that Respondent discriminated against Charging Party due to his race, American Indian, regarding harassment and hostile work environment in violation of Title VII."  (*See* Am. Compl. at Ex. 3.)  The only Respondent named in the EEOC Determination was Winchester Homes - Weyerhaeuser was not mentioned.  In its Determination letter, the EEOC also noted that it began efforts at conciliation.  Conciliation attempts failed and EEOC issued a Notice of Right to Sue on November 3, 2005.  (*See* Am. Compl. at Ex. 4.)

Plaintiff filed his initial complaint against Winchester, Weyerhaeuser, his supervisors Edward Duffy, Larry Freiert, Edward Brooks, and co-workers Gary Hall, Corie Jones, Kevin Holmes, Antoine Smith, Corie Rory, and Woodrow Gunther on February 1, 2006, alleging violations of Title VII.  Specifically, Atkins alleged one Count of Disparate Treatment and a second Count of Hostile Work Environment and Reprisal.  Plaintiff alleged all counts against all parties.

In response to plaintiff's complaint, Weyerhaeuser, Winchester, Freiert, Brooks, and Duffy, Gunther, Holmes, and Jones filed motions to dismiss on May 24, 2006.[2]  Atkins filed an amended complaint with the court on June 9, 2006, dropping the charges against his co-workers, Gary Hall, Corie Jones, Kevin Holmes, Antoine Smith, Cory Rory, and Woodrow Gunther.  In the amended complaint, Atkins also added claims under 42 U.S.C. § 1981, in addition to his earlier claims under Title VII.  Again, plaintiff asserted all counts against all parties.  Subsequently, Weyerhaeuser, Winchester, and Freiert, Brooks, and Duffy filed motions to dismiss Atkins's amended complaint.  On July 7, 2006, Atkins filed a response to Winchester's and Freiert, Brooks, and Duffy's motions to dismiss the amended complaint, but Atkins did not file a response to Weyerhaeuser's motion to dismiss.

## ANALYSIS

The three sets of defendants raise both procedural and substantive reasons why their motions to dismiss should be granted.  Each will be discussed in turn.

### A.    Procedural Arguments

#### 1.    Winchester Homes

Winchester argues that plaintiff's Title VII Claims were not timely filed.[3]   Under Title VII, an administrative charge of discrimination must be filed with the EEOC within 300 days for cases arising in Maryland.  42 U.S.C. §2000e-5(e)(1).  A timely charge with the EEOC is not a jurisdictional prerequisite to suit, but is a requirement that, like a statute of limitations, "is subject to waiver, estoppel, and equitable tolling."  *Zipes v. Trans World Airlines, Inc.*, 455 U.S.

---

[2]Freiert, Brooks, and Duffy submitted a joint motion to dismiss.  Gunther, Holmes, and Jones each filed individual motions to dismiss.

[3]Both Weyerhaeuser and the individual defendants adopt this argument as well.

385, 393 (1982). Both parties agree that the plaintiff filed a charge with the EEOC on November 30, 2004, which was within the 300-day window provided by law. Winchester claims that plaintiff's EEOC charge contained no statement of particulars, which is required by 29 C.F.R. §1601.12(a)(3) (a charge must contain a "clear and concise statement of the facts."), and that the charge was only perfected when plaintiff made an additional filing with the MCHR on January 21, 2005. This filing, however, was 342 days after plaintiff's termination, and therefore defendants argue that plaintiff did not timely file.

Pleadings in Title VII cases must be interpreted liberally. *Alvarado v. Bd. of Trustees of Montgomery Community College*, 848 F.2d 457, 460 (4th Cir. 1988). While no additional statement of particulars was attached to Atkins's EEOC filing as appended to his initial complaint, his amended complaint attaches an EEOC form, signed on November 30, 2004, (*see* Am. Compl. at Ex. 1), which not only lists the people he claims have discriminated against him but also provides details of the discrimination. In addition, in his amended complaint, Atkins attaches a statement, though unsigned and undated, also detailing the discrimination he faced at Winchester. (*Id.*) A principal function of the administrative charge is to initiate the investigatory and conciliatory procedures contemplated by Title VII. *See Edelman v. Lynchburg College*, 535 U.S. 106, 115 (2002). Here, the forms provided sufficient information for the EEOC to initiate its investigation. Indeed, there is no question that the EEOC accepted the plaintiff's filing, conducted its investigation, attempted conciliation with Winchester, and then issued its determination that Winchester discriminated against Atkins.[4]  Accordingly, Atkins

---

[4]Defendants claim that Atkins's EEOC form is "illegible" (Def. Mot. at 9, n.4.), but I was able to read and understand the form. In any case, the EEOC apparently found the form legible, as it initiated proceedings after the form was filed.

complied with 29 C.F.R. §1601.12(a)(3)'s requirements, and did timely and properly file.

Even if I were to find that Atkins's initial filing with the EEOC did not provide sufficient facts to initiate the EEOC investigation, he amended the EEOC charge with his filing with the MCHR on January 21, 2005. EEOC regulations provide that "[a] charge may be amended to ... amplify allegations made therein. Such amendments and amendments alleging additional acts which constitute unlawful employment practices related to or growing out of the subject matter of the original charge will relate back to the date the charge was first received." *Edelman*, 535 U.S. at 110, n. 2; *see also* 29 C.F.R. § 1601.12. Defendants concede that the filing with the MCHR fulfills the requirements of the EEOC regulations. Because that filing amplifies the allegations made in the initial EEOC charge, the MCHR filing properly relates back under § 1602.12, and is sufficient to fulfill the EEOC requirements.


### 2.      Freiert, Brooks, and Duffy

The individual defendants allege that plaintiff did not comply with the requirements of Federal Rules 4(e) and 12(b)(5) in his service of the summons and initial complaint. Defendants argue that plaintiff's process server improperly served Freiert, Duffy, and Brooks by handing the summonses to Kevin Holmes, a co-worker of Freiert, Duffy, and Brooks, and originally a defendant in the case, at the defendants' workplace. Rule 4(e) does not allow process to be served on individuals at their place of work unless personally served or left with an agent authorized to accept service. Fed. R. Civ. P. 4(e).[5] In response, Atkins attached an affidavit

---

[5]Atkins appears to have properly served defendants with his amended complaint, though that complaint was served approximately six months after the filing of his initial complaint.

from his process server, who asserts that he served "Kevin Holmes, a person authorized to accept service on ... behalf" of the individual defendants.

A co-worker is typically not considered an agent authorized to accept service under Rule 4(e), and the actual acceptance of service by the co-worker does not necessarily indicate that service was properly effectuated on the individual defendants. *See Wright and Miller*, Federal Practice and Procedure Civil 3d §1097 (2002) ("[T]he federal courts have held that claims by an agent of having authority to receive process or the fact that an agent actually accepts process is not enough to bind the defendant to the court's jurisdiction; there must be evidence that the defendant intended to confer the authority upon the agent..."). While the amended complaint appears to have been properly served, it was filed on June 9, 2006, outside of the 120-day window prescribed by Rule 4(m). Accordingly, it appears that Atkins did not comply with the requirements of Rule 4.

As noted above, however, defendants did have actual notice of the suit after the summons and complaint were served, and the amended complaint was properly served. Rule 4(m) states that if a plaintiff shows good cause for the failure to serve, "the court shall extend the time for service for an appropriate period." Indeed, the Advisory Committee Notes to Rule 4(m) state that the amendment to Rule 4(m) allows district courts to relieve plaintiffs from the 120-day period "even if there is no good cause shown," and this court (and the majority of circuit courts) has agreed that district courts have the discretion to extend the time allowed for service of process. *See Melton v. Tyco Valves & Controls, Inc.*, 211 F.R.D. 288, 289-90 (D. Md. 2002); *Hammad v. Tate Access Floors, Inc.*, 31 F. Supp. 2d 524, 527-28 (D. Md. 1999). Here, because defendant had actual notice of the pendency of the action, the rules are entitled to a "liberal

construction." *Armco, Inc. v. Penrod-Stauffer Building Systems, Inc.*, 733 F.2d 1087, 1089 (4th Cir. 1984) ("When there is actual notice, every technical violation of the rule or failure of strict compliance may not invalidate the service of process," though motion to dismiss for insufficient process was granted); *see also United States v. 630 Ardmore Drive, City of Durham, Parkwood Twp., Durham County, N.C.*, 178 F. Supp. 2d 572, 579 (M.D.N.C. 2001) (holding that defendant's motion to dismiss for failure to serve process would be denied where defendant had actual notice of complaint).

The individual defendants conceded they had actual notice of the suit after process was served on Holmes, (*see* Def.'s Reply at 8), and do not assert that any prejudice resulted from the service to Holmes. Because Atkins made some effort to serve the defendants, because no prejudice resulted, and because the defendants apparently had actual notice of the suit, defendants' motions to dismiss for insufficient process will be denied.

### 3.    Weyerhaeuser

On June 23, 2006, Weyerhaeuser filed its motion to dismiss Atkins's amended complaint; Winchester and the individual defendants filed their motions to dismiss days later. While Atkins responded to Winchester and the individual defendants' motions, Atkins failed to file any brief responding to Weyerhaeuser's motion to dismiss. On July 21, 2006, Weyerhaeuser alerted the court and the parties that Atkins had not responded to its motion to dismiss and asked to be removed from the case because its motion appeared to be uncontested. Atkins did not respond to this filing either. Indeed, in the six months since Weyerhaeuser's filing, Atkins has not attempted to respond to Weyerhaeuser's motion to dismiss. Because Weyerhaeuser's motion to

dismiss is unopposed, its motion will be granted.

Even if Atkins were to have responded to Weyerhaeuser's motion, Atkins has not properly alleged that Weyerhaeuser was Atkins's employer.  The only connection that Atkins alleges between himself and Weyerhaeuser are phone calls he allegedly made to Weyerhaeuser's toll-free discrimination hotline, which were not returned.  Other than those phone calls, Atkins apparently bases his suit against Weyerhaeuser simply on the parent-subsidiary relationship that exists between Weyerhaeuser and Winchester, as he points to no other actions that Weyerhaeuser took in connection with the discrimination.  Absent any allegation of common management, interrelation of operations, centralized control, or degree of financial control, the mere fact of a parent-subsidiary relationship is not sufficient to sustain a charge against Weyerhaeuser.  *Glunt v. GES Exposition Services, Inc.*, 123 F. Supp. 2d 847, 875 (D. Md. 2000) ("The mere fact of a parent-subsidiary relationship between co-defendants is not sufficient, as a matter of law, to impute liability to the parent" under Title VII).  For these additional reasons, Weyerhaeuser's motion to dismiss will be granted.

### B.      Substantive Arguments

#### 1.      Winchester

##### a.      Disparate Treatment

Atkins alleges that he was discriminated against by Winchester in violation of Title VII and 42 U.S.C.A. § 1981.  Section 1981 (and Title VII) claims are analyzed under the well known burden shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  The plaintiff must first establish, by a preponderance of the evidence, a *prima facie* case of

discrimination.  *See St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 506 (1993).  If the *prima facie* case is established, the burden then shifts to the employer to produce evidence that the employment decision was made for legitimate nondiscriminatory reasons.  *See Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 254 (1981).  Once the employer produces sufficient evidence to support a nondiscriminatory explanation for its decision, the plaintiff must be afforded the opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.  *See St. Mary's Honor Center*, 509 U.S. at 507-08.  The *prima facie* case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated, although it will not *always* be adequate to sustain a jury's finding of liability.  *Reeves v. Sanderson Plumbing Products*, 530 U.S. 133, 148 (2000) ("Certainly there will be instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory.").

Atkins alleges that he is a member of a protected class and that members outside his protected class were treated more favorably than he.  Atkins also contends that he suffered several adverse employment actions, including his termination from Winchester.  While Winchester concedes that plaintiff's firing would qualify as an adverse employment action, it argues that some of plaintiff's claimed adverse employment actions do not qualify under Section 1981.  Specifically, Winchester argues that Atkins's meetings with Duffy, where Atkins claims Duffy threatened him with discipline, are not adverse employment actions.

I agree that Atkins's meetings with Duffy concerning allegations of racial harassment are

not adverse employment actions.  Atkins provided few details of those meetings or their

consequences.  (*See* Am. Compl. at ¶¶ 22, 23.)  He does not allege with any specificity what

discipline he faced as a result of the meetings with Duffy.  In the absence of any allegation of

any adverse event resulting from those meetings or without further specification of what

happened in those sessions, the meetings, in and of themselves, are not adverse events.  *See, e.g.,*

*Spriggs v. Public Service Comm'n of Maryland*, 197 F. Supp. 2d 388, 396-97 (D. Md. 2002)

(holding that plaintiff must establish that defendant's actions adversely affected her

employment).

Winchester also argues that Atkins's meeting with Brooks following Atkins's encounter

with Gunther was not an adverse employment action.  Winchester describes Brooks as

"counseling" Atkins after the encounter, where Atkins describes being "written up" by Brooks.

While negative performance evaluations may constitute adverse employment actions, Atkins

does not allege that any negative performance evaluation written by Brooks led to an adverse

employment action, such as his firing.  *See James v. Booz-Allen & Hamilton, Inc.,* 368 F.3d 371,

377 (4th Cir. 2004) (explaining that negative performance evaluations can be adverse

employment actions where the evaluation is later used to alter the terms of employment).  In the

absence of an allegation linking that negative evaluation to his subsequent firing, the evaluation

by Brooks is not, in and of itself, an adverse employment action.


### b.  Retaliation

Plaintiff also asserts a claim for retaliation under Section 1981.  In order to prove his case

for retaliation, plaintiff must establish that 1) he engaged in protected activity, 2) he suffered an

adverse employment action, and 3) a causal relationship existed between the protected activity

and the adverse employment action.  *See e.g.*, *Hooven-Lewis v. Caldera*., 249 F.3d 259, 272 (4th

Cir. 2001).  Plaintiff claims that he received adverse employment actions, including termination,

after lawfully complaining about the racial harassment he suffered.  Winchester argues that there

is no causal link between plaintiff's complaints about the harassment and his termination.

The time period in which plaintiff engaged in protected activity, by raising complaints

with his supervisors about the racial harassment he faced, is relevant for the analysis.  Atkins

makes no specific allegations of protected activity in the period immediately leading up to his

termination.  He does claim that he brought the racial harassment he suffered to the attention of

his supervisors in March 2003, in the wake of the incident with Gary Hall.  (Am. Compl. at ¶ ¶

21, 22.)  But the rest of plaintiff's allegations of complaints to his supervisors are vague in terms

of timing: Atkins alleges that "during this time," he complained to Freiert about an incident

involving Antoine Smith, and "thereafter" complained to Duffy about an incident involving

Gunther.  *Id.* at ¶ ¶ 23, 26.  Nowhere in his complaint does Atkins allege that defendants made

any statements indicating they were retaliating against him because of his protected activity, and

Atkins's subjective belief that he was retaliated against is not sufficient to make a prima facie

case.  In the absence of other evidence regarding the defendants' intention to retaliate, the time

period between the protected activity and the alleged retaliation must not be lengthy.  *See Causey

v. Balog*, 162 F.3d 795, 803 (4th Cir. 2005) (thirteen-month interval between protected activity

and retaliation deemed too long to establish causal link).  Atkins does not allege when his last

protected activity occurred and, thus, it is unclear what the length of time was between the

activity and the alleged retaliation.  Because Atkins did not plead with any specificity when the

remainder of his racial harassment complaints to his supervisors occurred, he cannot establish the causal link between the protected activity and the adverse employment necessary to sustain a retaliation claim.

### c.    Harassment/Hostile Environment

Under Fourth Circuit law, to succeed on a claim for a racially hostile work environment, the employee must show that the harassment was: 1) unwelcome, 2) based on race, 3) sufficiently severe or pervasive to alter the conditions of employment, and 4) there was some basis for imposing liability on the employer.  *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 183-84 (4th Cir. 2001).  Here there is no question that plaintiff's harassment was unwelcome and based on race.  Nor does Winchester argue, at this stage, that the harassment was not sufficiently severe or pervasive.  Instead, Winchester argues that there is no basis for imposing liability because the racial slurs that were levied at Atkins were stated by Atkins's co-workers, and not by his supervisors.

An employer may be liable for co-worker harassment when it has actual or constructive notice of the harassment and fails to take appropriate corrective action.  *See, e.g., Faragher v. City of Boca Raton*, 524 U.S. 775, 799 (1998); *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 759 (1998).  Here, there is no question that Atkins properly alleges actual and constructive notice, because he claims that his supervisors had knowledge of the co-workers' racial harassment.  Atkins complained about the harassment to Duffy, Brooks, and Freiert on several occasions.  (Am. Compl. at ¶ ¶ 22-26.)  Atkins also alleges that he voiced his complaints both to Winchester's Human Resources Department and to Weyerhaeuser's toll-free discrimination

hotline in 2003 and 2004.  (*Id.* at ¶¶ 31-32.)  Furthermore, Atkins alleges that his supervisors were often present when the racial harassment occurred.  (*Id.* at ¶ 20.)  Because there is ample basis for imputing liability to Winchester at this stage of the case, the fourth prong of the hostile environment test is satisfied, and the motion to dismiss will be denied as to the hostile work environment claim.[6]

### 2.        Freiert, Brooks, and Duffy

Atkins's supervisors Freiert, Brooks, and Duffy argue that they should be dismissed from the case because: 1) Title VII does not recognize claims against individual defendants, and 2) Atkins's § 1981 claims require intentional discrimination, which was not alleged in Atkins's complaint.

### a.        Title VII

Defendants correctly argue that Title VII does not recognize claims against individual defendants.  *See Lissau v. Southern Food Service, Inc.*, 159 F.3d 177, 180 (4th Cir. 1998).  Accordingly, plaintiff's Title VII claims against Freiert, Brooks, and Duffy in their individual capacity will be dismissed.

### b.        Section 1981

---

[6]While Atkins's complaint alleges that the acts constituting the hostile work environment were continuous, *see* Am. Compl. at ¶¶ 54-62, to survive summary judgment, Atkins will need to more clearly establish that at least one of the acts constituting the hostile work environment occurred during the 300-day filing period prescribed by Title VII.  *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 117 (2002) ("In order for the charge to be timely, the employee need only file a charge within 180 or 300 days of any act that is part of the hostile work environment.")

In his amended complaint, plaintiff asserts claims of disparate treatment and harassment, and retaliation under both Title VII and 42 U.S.C. §1981.  The retaliation claims will be dismissed for the reasons discussed above as to Winchester.  Defendants also move to dismiss the other claims.

Generally, to make out a prima facie case for employment discrimination, the plaintiff must show that: 1) he is a member of a protected class, 2) he was performing satisfactorily, 3) he suffered an adverse employment action, and 4) other similarly situated employees outside his protected class were treated more favorably.  *See, e.g., Newman v. Giant Food, Inc.*, 187 F. Supp. 2d 524, 528 (D. Md. 2002).  Under Section 1981, individual defendants may only be held liable for purposeful and intentional discrimination.  *Carson v. Giant Food, Inc.*, 187 F. Supp. 2d 462, 483 (D. Md. 2002) (granting motion for summary judgment under Section 1981 where individual defendants were aware of racial problems in workplace and did not respond properly, but did not individually participate in the racial problems).  Plaintiff alleges that he is a member of a protected class and that members outside his protected class were treated more favorably than he.  Defendants argue that plaintiff suffered no adverse employment action that could give rise to a Section 1981 claim that is attributable to intentional discrimination at the hands of the individual defendants.

Atkins alleges that several of the individual defendants' actions amounted to intentional discrimination, resulting in adverse employment actions.  In his complaint, plaintiff alleges that Duffy constantly called plaintiff into Duffy's office over workplace incidents involving allegations of racial harassment while simultaneously threatening plaintiff with discipline.  (Am. Compl. at ¶ 40.)  Atkins also alleges that he suffered an adverse employment action when

-17-

Brooks disciplined plaintiff, but not Gunther, for an incident involving racial harassment caused by Gunther.  *(Id*. at ¶ 41.)  Atkins further claims that his termination at the hands of Duffy was disparate treatment and unlawful discrimination. (*Id*. at ¶ 47.)  Lastly, plaintiff alleges that Duffy, Brooks, and Freiert tolerated and perpetuated the harassment perpetrated by Atkins's co-workers.   (*Id.* at 44.)

Some of Atkins's claims against Duffy will go forward.  Termination is an adverse employment action for *prima facie* purposes.  *See, e.g., Yashenko v. Harrah's NC Casino Co.*, *LLC*, 446 F.3d 541, 551 (4th Cir. 2006) (undisputed that termination was an adverse employment action).  Individuals may be liable under Section 1981 when they "authorize, direct, or participate in" a discriminatory act.  *Manuel v. Int'l. Harvester Co.*, 502 F. Supp. 45, 50 (N.D. Ill. 1980).  In the termination context, if a supervisor has some responsibility for the discriminatory firing, he may be held liable under Section 1981.  Atkins alleges that Duffy fired him and, before discovery, it is not possible to ascertain what role Duffy had in firing Atkins.  As noted above, however, the adverse employment actions alleged against Duffy for the meetings concerning allegations of racial harassment are much more vague.  In the absence of any allegation of any consequence of those meetings, plaintiff cannot sustain that the meetings resulted in an adverse action.  Thus, only the claims against Duffy for his firing of Atkins will survive the motion to dismiss.

The claims against Brooks and Freiert, however, will be dismissed.  As previously discussed, while negative performance evaluations may constitute adverse employment actions, Atkins does not allege that Brooks' negative performance evaluation following his altercation with Gunther led to an adverse employment action.  *See Booz-Allen & Hamilton, Inc.,* 368 F.3d

-18-

at 377.  Again, in the absence of an allegation linking that negative evaluation to his subsequent firing, the evaluation is not, in and of itself, an adverse employment action.

Further, the claims against the individual defendants for the failure to investigate or prevent co-workers' harassment do not allege intentional discrimination for purposes of Section 1981.  Under Section 1981, individual supervisors must play an active role in the harassment to trigger liability.  *See, e.g., Carson*, 187 F. Supp. 2d at 483 (summary judgment granted on Section 1981 claim where plaintiffs alleged only that the individual supervisors were aware of racial problems in the workplace after it occurred and did not respond properly).  Thus, the claims against Duffy, Brooks, and Freiert for not preventing co-worker harassment will be dismissed.

A separate order follows.


    January 17, 2007                                    /s/
Date                                          Catherine C. Blake
                                              United States District Judge

-19-